**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

UNITED STATES OF AMERICA,

      *Plaintiff,*

vs.

      Case No. 18-10106-EFM

ADDISON LEWIS and BRANDI LEWIS,

      *Defendants.*

**MEMORANDUM AND ORDER**

Before the Court is Defendants Addison and Brandi Lewis' Motion to Suppress (Doc. 50). Defendants seek to suppress evidence stemming from a Veterans Affairs ("VA") Compensation and Pension ("C&P") examination. The Court held a hearing on the motion on September 22 and 24, 2020. For the following reasons, the Court denies Defendants' Motion to Suppress.

## I.      Factual and Procedural Background

The VA consists of three subsidiaries. The Veterans Health Administration ("VHA") provides veterans with testing, C&P exams, and other healthcare services. The Veterans Benefits Administration ("VBA") makes benefit decisions and monitors benefit disbursements. The

Veterans Affairs Office of Inspector General ("OIG") acts as the agency's primary internal watchdog but is governed independently from the VHA and VBA.[1]

Pursuant to its directive to investigate fraud and waste within the VA, the OIG decided to identify veterans possessing valid driver's licenses while concurrently receiving disability benefits for visual impairment.  In 2017, Addison Lewis was rated as 100% blind by the VBA but possessed a valid Kansas driver's license.  As a result, the OIG opened an investigation into Addison Lewis and shared all relevant information with the VBA, which in turn also reviewed Lewis' file.  The VBA then contacted Lewis to set up a C&P examination to verify his disability status.

The VBA collaborated with the OIG and VHA to schedule the C&P exam for September 28, 2017.  OIG Agent Tim Mugrage contacted the VHA optometrist who would conduct the examination, Dr. John Volosin, and requested his consent to record the examination.  Volosin gave his consent, and Mugrage and the VBA installed a camera to covertly record video and audio of the exam.  The OIG did not obtain a search warrant for these actions.

Addison and Brandi Lewis attended the September 28 C&P exam.  Volosin performed several medical tests, physically examined Addison, and interviewed him about his symptoms and medical history.  In addition to conducting standard C&P exam tests for visual impairments, Volosin also performed supplementary tests, one of which was designed to determine whether veterans were malingering and misleading VHA providers.  Notably, Addison's actions convinced Volosin that he was malingering.  Following the exam, Volosin recorded his findings without noting his opinion that Lewis was malingering, or otherwise describing Lewis' behavior throughout the exam.  However, Volosin conveyed his opinion that Lewis was malingering to

---

[1] Testimony indicated that OIG agents ultimately report to the IG—who is appointed directly by the President—rather than the Secretary of Veterans Affairs.

-2-

Mugrage.  Mugrage reviewed the video and audio recording of the C&P exam and Volosin's written and oral findings.  Following that review, Mugrage was also convinced that Lewis was malingering.

As part of the same investigation but separate from the C&P exam, the OIG installed a surveillance camera on a public utility pole across the street from Defendants' residence.  The OIG did not obtain a search warrant to install the camera.  The camera recorded Addison Lewis working in his yard and driveway, picking up the mail, entering and leaving the property in motor vehicles, and generally performing actions inconsistent with 100% visual impairment.

A grand jury indicted the Defendants with conspiracy to defraud the United States, theft of VA benefits, and theft of Social Security Administration benefits.  Defendants now jointly move to suppress the evidence stemming from the C&P exam, arguing it violated their Fourth, Fifth, and Fourteenth Amendment rights.  Defendants also moved to suppress the pole camera video, arguing that it violates their reasonable expectation of privacy.

The Court held a hearing on the motions on September 22 and 24.  At that time, the Court denied Defendants' motion to suppress the pole camera footage, concluding that neither Tenth Circuit nor Supreme Court Fourth Amendment law extends the right of privacy to an area of Defendants' property visible from a public road.[2]  The Court took Defendants' remaining motion to suppress under advisement and rules on it now.

---

[2] The Court noted that Fourth Amendment law does not distinguish what a car driving by or a covertly installed surveillance camera can see; the area of a defendant's property clearly visible from a public area and not within the curtilage of the home is not protected by the right of privacy.

## II.    Legal Standard

### A.    Fourth Amendment

The Fourth Amendment states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall be not violated . . . ."[3] Under the exclusionary rule, "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure."[4]  If a search or seizure violates the Fourth Amendment, the "fruit of the poisonous tree" doctrine prohibits the admission of any subsequently obtained evidence, including information, objects, or statements.[5] Searches must be authorized by a warrant unless an exception to the warrant requirement applies.[6] The government bears the burden to prove that a warrantless search or seizure was justified.[7]

### B.    Fifth and Fourteenth Amendments

To protect a suspect's Fifth Amendment right against self-incrimination, law enforcement officers must administer the prophylactic warnings set forth in *Miranda v. Arizona* before interrogating any suspect held in custody.[8]  Failure to advise a suspect of the *Miranda* rights renders inadmissible all statements made during a custodial interrogation.[9]  The Government concedes that Defendant did not receive a *Miranda* warning and that his interview with law

---

[3] U.S. CONST. amend. IV.

[4] *United States v. Calandra*, 414 U.S. 338, 347 (1974).

[5] *Wong Sun v. United States*, 371 U.S. 471, 487–88 (1963).

[6] *California v. Carney*, 471 U.S. 386, 390 (1985).

[7] *United States v. Zubia-Melendez*, 263 F.3d 1155, 1160 (10th Cir. 2001) (citations omitted).

[8] 384 U.S. 436, 444 (1966).

[9] *Id.* at 492.

enforcement officers was an interrogation.  The issue before the Court, therefore, is whether Defendant was in custody at the time of the interrogation.[10]

In *Miranda*, the Supreme Court stated that a suspect is in custody when "deprived of his freedom of action in any significant way."[11]  The custody determination is objective—courts consider how a reasonable person would feel under the same circumstances and ignore the subjective views of the interrogating officers.[12]  Courts assume the reasonable person "does not have a guilty state of mind and does not have peculiar mental or emotional conditions that are not apparent to the questioning officer."[13]  Examining the totality of circumstances from the perspective of the reasonable person, courts engage in a fact-specific analysis of the following factors: (1) whether law enforcement officers informed the suspect that he or she was free to leave or to refrain from answering questions; (2) the nature and length of the questioning; and (3) whether the circumstances gave rise to a police-dominated atmosphere.[14]

Although a Fourteenth Amendment due process argument analyzes the same factors as a Fifth Amendment custody determination, the inquiry focuses on the suspect's motivations for speaking with the police rather than the suspect's objective state of being.  Just as a suspect who is questioned at a police station may not be "in custody" for purposes of *Miranda*, a suspect may

---

[10] *See United States v. Revels*, 510 F.3d 1269, 1273 (10th Cir. 2007) (noting that a *Miranda* warning is necessary when "(1) the individual [is] in custody, and (2) the individual [is] subjected to questioning that meets the legal definition of interrogation").

[11] 384 U.S. at 444.  *See also Berkemer v. McCarty*, 468 U.S. 420, 441 (1984) (noting that a defendant is in custody when "subjected to restraints comparable to those associated with a formal arrest").

[12] *See Berkemer*, 468 U.S. at 442; *Revels*, 510 F.3d at 1275 (citing *Stansbury v. California*, 511 U.S. 318, 323 (1994)).

[13] *United States v. Erving L.*, 147 F.3d 1240, 1247 (10th Cir. 1998).

[14] *See United States v. Griffin*, 7 F.3d 1512, 1518–19 (10th Cir. 1993), *accord Revels*, 510 F.3d at 1275.

not be "in custody" but still feel coerced into giving a confession.  For example, the police may tell a suspect that he is free to leave, but threaten future consequences that compel the suspect to answer incriminating questions or divulge inculpatory information.  For that reason, courts must ensure that statements admitted at trial violate neither the Fifth nor Fourteenth Amendments.

### III.    Analysis

Defendants' ask the Court to suppress evidence collected during the September 28, 2017 C&P exam under two theories.  First, Defendants argue that the warrantless recording of the exam was an unconstitutional search in violation of the Fourth Amendment and that the Court should therefore suppress the audio and video recordings.  Second, Defendants contend that under the Fifth Amendment, the Court should suppress their statements made during the C&P exam because they were involuntary and because the exam constituted a custodial interrogation without a preceding *Miranda* warning.  At the hearing, the Court rejected Defendants' Fifth Amendment claim as being meritless.  Defendants voluntarily attended the C&P exam and were at no time restrained or otherwise prevented from leaving.  Although Defendants were motivated to attend the exam for fear of losing disability benefits, that hardly approaches the nature of a custodial interrogation under the Fifth Amendment.  As such, the Court denies Defendants' Fifth Amendment claim and proceeds to the remaining Fourth Amendment claim.

Generally, "application of the Fourth Amendment depends on whether the person invoking its protection can claim a . . . 'reasonable . . . expectation of privacy' that has been invaded by government action."[15]  To determine whether a defendant has a reasonable expectation of privacy,

---

[15] *Smith v. Maryland*, 442 U.S. 735, 740 (1979) (internal citations omitted).

courts apply the two-part test outlined by the Supreme Court in *Katz v. United States*.[16]  Courts first look to "whether the individual, by his conduct, has 'exhibited an actual (subjective) expectation of privacy.'"[17]  Next, courts consider "whether the individual's subjective expectation of privacy is one that society is prepared to recognize as reasonable."[18]

This case is remarkably similar to the District of Montana's case in *United States v. Hughes*.[19]  Accordingly, the Court finds *Hughes*' reasoning persuasive to this case.  In *Hughes*, the defendant was charged with theft of government services stemming from various misrepresentations to the VA.[20]  The defendant was rated as 100% disabled based on his diagnosed multiple sclerosis, although he was seen riding a motorcycle, carrying his wheelchair, and not using his cane.[21]  As part of a criminal investigation opened by the OIG, agents from the VBA, VHA, and OIG coordinated a C&P exam that they covertly recorded.[22]  They did not obtain a warrant to do so, but the OIG agent did receive the VHA provider's consent to record the exam.[23]  The defendant sought to suppress the video and audio recording from the exam, contending it violated his reasonable expectation of privacy and was a warrantless search under the Fourth Amendment.[24]

---

[16] 389 U.S. 347 (1967).

[17] *Smith*, 442 U.S. at 740 (quoting *Katz*, 389 U.S. at 361).

[18] *Id*. (internal quotations omitted).

[19] 2019 WL 4740256 (D. Mont. 2019).

[20] *Id*. at *1.

[21] *Id*.

[22] *Id*. at *2.

[23] *Id*.

[24] *Id*. at *2–3.

The court in *Hughes* ruled that the defendant's argument failed at the first step of *Katz* because he did not display a subjective expectation of privacy, stating that "[a] defendant generally has no privacy interest in that which he voluntarily reveals to a government agent."[25]  The court pointed out that:

> Hughes did not expect that his conversation with [the C&P examiner] would be shared freely.  However, the test is not whether a defendant would expect or welcome law enforcement surveillance; if it were, the first step of the *Katz* test would always be satisfied.  It is enough that, upon conclusion of the exam, Hughes expected [the C&P examiner] to share the results of the questionnaire with government actors who were not involved in providing medical treatment to Hughes but instead in assessing his disability to ensure the appropriate provision of benefits.[26]

Notably, the court added that "[t]he use of audio and video recording technology does not alter the equation. A defendant 'cannot reasonably argue that a recording violates his legitimate privacy interest when it reveals no more than what was already visible to the agent.'"[27]

In this case, Defendants similarly fail to satisfy the first step of *Katz*.  They willingly attended the C&P exam to remain eligible for VA benefits.  They agreed to adhere to the VHA's procedures, and they did not object to Volosin conducting the exam.  It would be objectively unreasonable for a similarly situated veteran to believe that Volosin would not disclose information from the exam to the VBA or other VA agents.  In fact, the entire purpose of the C&P exam—as clearly indicated in the VHA's disclosures—is to evaluate a veteran's disability for the purpose of making benefits decisions.  The means used to convey such information do not alter a veteran's reasonable expectation of privacy.  It is immaterial whether Volosin informed the VBA via detailed

---

[25] *Id*. at *4 (quoting *United States v. Wahchumwah*, 710 F.3d 862, 867 (9th Cir. 2013)).

[26] *Id*. at *5.

[27] *Id*. (quoting *Wahchumwah*, 710 F.3d at 867) (alteration omitted).

written note, comprehensive oral description, or visual and audio recording.  What matters is that Defendants' lacked a subjective expectation of privacy because they knew information from the C&P exam would be conveyed to other VA agents for the express purpose of determining Addison's ongoing eligibility for benefits.

This analysis is analogous to the Fourth Amendment issue concerning the pole camera. Had the pole camera captured the interior or exterior of Defendants' house—or even past their trees—they would have had a stronger expectation of privacy because someone driving by on the public road could not have seen the same.  But the areas of their property exposed to the public were not within the purview of their reasonable expectation of privacy.  Similarly, Defendants lacked a reasonable expectation of privacy in the C&P exam because they knew Volosin would convey his findings to the VBA.  The information they willingly exposed to him, they willingly exposed to the VBA.  Volosin could have written an incredibly detailed and descriptive report, approaching the specificity of the visual recording.  Even though he did not do so, Defendants nevertheless knew that he could.  Simply because a camera captured a similar level of detail does not invalidate Defendants' subjective expectations.  As such, the Court concludes that Defendants fail to satisfy the first step of *Katz* and therefore denies their Fourth Amendment claim.

**IT IS THEREFORE ORDERED** that Defendants' Joint Motion to Suppress (Doc. 50) is **DENIED.**

**IT IS SO ORDERED.**

Dated this 2nd day of October, 2020.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

-9-